UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,　　　　　　　　　　　　Civil No. 10-2595 (JRT/FLN)

　　　　　　Petitioner,

　　v.　　　　　　　　　　　　　　　　　　　　　**REPORT AND**
　　　　　　　　　　　　　　　　　　　　　　　　**RECOMMENDATION**
Jonathan Jones,

　　　　　　Respondent.

_____

Lonnie F. Bryan, Assistant U.S. Attorney, for Petitioner.
Katherine M. Menendez, Assistant Federal Public Defender, for Respondent.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on September 22, 2010 for a hearing on the Government's Petition to Determine Present Mental Condition of an Imprisoned Person Due for Release Under 18 U.S.C. § 4246 (ECF No. 1). At the hearing, Andrew Simcox and Pamela Seebach testified for the Government, and Jonathan Jones ("Respondent") testified on his own behalf. The Court received twelve exhibits into evidence.[1] Both parties submitted post-hearing briefs. (ECF Nos. 13 and 19.)

The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, the Court recommends that the

---

[1] Petitioner offered exhibits A through I. Exhibit A is a Letter from Warden B.R. Jett to Greg Brooker (dated June 14, 2010); Exhibit B is a Federal Medical Center Rochester, MN Risk Assessment; Exhibit C is a BOP Central and Medical File before 8/31/2010 (electronic and paper); Exhibit D is a Curriculum Vitae for Andrew Simcox, Ph.D., ABPP; Exhibit E is a Curriculum Vitae for Pamela J. Seebach, LICSW; Exhibit F is an Affidavit-Complaint (08/14/01); Exhibit G is an Incident Report (09/20/2010); Exhibit H is a chart of Placement Attempts; and Exhibit I is a Clinical Record- Doctor's Orders (BOP Central Medical File since 9/1/2010).
　　Respondent offered Exhibits 1 through 3. Exhibit 1 is a Northern District of Florida (Panama City) Criminal Docket, Case No. 5:06-cr-186-RS; Exhibit 2 is a Presentence Investigation Report; Exhibit 3 consists of Letters to Respondent from his mother (dated 4/9/10 and 7/28/10).

Government's Petition to Determine Present Mental Condition of an Imprisoned Person Due for Release Under 18 U.S.C. § 4246 (ECF No. 1) be **GRANTED**.

## I. FINDINGS OF FACT

On April 2, 2008, Jonathan Jones ("Respondent") pled guilty to four counts of threats made against the president, former president or presidential family member. On June 11, 2008, the United States District Court for the Northern District of Florida sentenced Respondent to 30 months imprisonment and three years of supervised released. Respondent was scheduled for release on June 30, 2010.

On June 24, 2010, the Government filed the instant Petition to Determine Present Mental Condition of an Imprisoned Person Due for Release Under 18 U.S.C. § 4246. (ECF No. 1.) Specifically, the Government seeks to involuntarily commit Respondent to the custody of the Attorney General for continued confinement at the Federal Medical Center in Rochester, Minnesota ("FMC Rochester"). The Petition alleges that Respondent is presently suffering from a mental disease or defect that "would create a substantial risk of bodily injury to another person or serious damage to the property of another should [R]espondent be released." (ECF No. 1.)

**A.     Testimony of Andrew Simcox**

Chief of Psychology at FMC Rochester, Andrew Simcox, Ph.D., ABPP, testified at the hearing on September 22, 2010 regarding Respondent's mental impairments, medical history, and treatment at FMC Rochester. Dr. Simcox has independently provided forensic evaluations for federal courts since 1993 and has known Respondent since his admission to FMC Rochester in 2008 for mental health treatment. (Tr. 5.)

Dr. Simcox testified that, to a reasonable degree of professional certainty, Respondent "has

a mental defect" and "poses a risk to the community." (Tr. 6.)  Dr. Simcox explained that the "mental defect" to which he referred was Respondent's mild to moderate mental retardation.[2] (*See* Tr. 6-7.) Respondent has also been diagnosed with antisocial personality disorder, with borderline features. (Ex. B.)  He is HIV positive, has a provisional diagnosis of pedophilia, and a history of inappropriate sexual behavior and substance abuse as well. (Ex. B.) He also has a history of intermittent auditory hallucinations and a "rule out" diagnosis of schizoaffective disorder. (Ex. B.) Dr. Simcox explained that Respondent's other problems complicate his level of functioning and that Respondent "is clearly a person who has not been able to function outside of a supervised setting for any length of time." (Tr. 8.) Since age 14, Respondent has been almost continuously institutionalized and "has spent a very minimal amount of time in any community setting." (Tr. 8.) He was hospitalized from ages 14 to 18 and was discharged to another facility. (Tr. 8.) At about age 21, he was arrested for performing non-consensual oral sex on a sleeping 12-year-old boy and has been in custody ever since. (Tr. 8, 36.)

       To summarize Respondent's condition, Dr. Simcox stated:

> I would say it's the synergistic effect of his medical illness, which is the HIV, which is a special condition that raises extra concerns. Substance abuse, which makes individuals more impulsive and reduces their judgment. A personality disorder, which is high levels of impulsivity, aggressiveness, poor emotional control. Mental retardation, which involves very poor problem solving, very primitive kind of functioning. Along with the mental illness, which would possibly involve mood instability and psychosis. I think when you combine all of those problems, it creates -- any one of those problems we probably would not be seeking a commitment of Mr. Jones. But I think when you take a constellation of all those problems together, it causes him to pose a substantial risk to members of the community.

---

[2] Given that the BOP Risk Assessment panel diagnosed Respondent "near the low end of the mild range of mental retardation or the high end of moderate range of mental retardation" (Ex. B), Dr. Simcox testified that a "safe" diagnosis would be mild mental retardation (Tr. 7).

(Tr. 30-31.) Dr. Simcox further testified that, if released, Respondent's inability to provide for his own needs would eventually become very frustrating to him and would result in Respondent becoming "at risk for aggression again at some point." (Tr. 20.)

Dr. Simcox also represented that Respondent has been housed in the special housing unit (SHU) at all times since he was admitted to FMC Rochester "except for about eight days," and as a result of this placement, he has been much more isolated than the general population at the facility. (Tr. 11.) He further stated that Respondent "makes sexually inappropriate comments" to some of the young, male nurses and inmate companions at the facility and engages in "a lot of sexually explicit . . . language and propositions." (Tr. 11-13.) Dr. Simcox explained that Respondent's potential dangerousness stems from his infectious disease (HIV) that can be transmitted to others through sexual contact as well as the concern that Respondent "could have sexual contact with a child." (Tr. 15.) The molestation of a child would be considered "bodily injury." (Tr. 15-16.) Dr. Simcox explained that Respondent "is quite child-like in his presentation and in his way of thinking, and it would make sense that he would feel comfortable among children. And it's clear he has a history of having sexual contact with a child." (Tr. 15.)

**B.     Testimony of Pamela Seebach**

Pamela Seebach is a clinical social worker in the psychiatric building at FMC Rochester. (Tr. 70.) She testified at the hearing regarding Respondent's discharge planning. (Tr. 70.) Ms. Seebach testified that she contacted Respondent's mother, who expressed a desire to have Respondent placed in her home, however, U.S. Probation determined that her home was not a suitable placement option as it would not provide sufficient structure and stability for Respondent. (Tr. 70-71.) Ms. Seebach also contacted the Interstate Compact Coordinator in Florida, who represented that the Florida state

hospital could not accept Respondent "due to his history of sexual predation." (Tr. 71-72.) She further testified that the Agency for People with Disabilities in Florida declined to accept Respondent because he failed to meet residency, IQ and adaptive functioning requirements. (Tr. 72.) She testified that she also "talked to several other mental health providers, crisis stabilization units and so forth, and he was not accepted into any of them." (Tr. 73; *see also* Ex. H.)

**C.     Testimony of Jonathan Jones**

At the hearing, Respondent indicated that he understood the nature of the commitment proceedings. (Tr. 78.) He testified that, if released, he intended to go to his nephew's home in Georgia and that he planned to "tend to [his] mother" because "she is getting old." (Tr. 78, 79.) He further stated that it was his intention to continue taking his medication and that he understands the ways in which he could transmit his HIV. (Tr. 78-79.) He testified that he does not want to spread the disease to anyone and that he understands that spreading the disease would cause harm to others. (Tr. 79.)

## II. RELEVANT LEGAL STANDARD

18 U.S.C. § 4246 "provides for the indefinite hospitalization of a federal prisoner who is due for release but who, as the result of a mental illness, poses a significant danger to the general public." *United States v. Williams,* 299 F.3d 673, 676 (8th Cir. 2002). The statute provides for a hearing in order for the court to determine whether "the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(d). To involuntarily hospitalize such a prisoner, the Government bears the burden of demonstrating, by clear and convincing evidence: "(1) a mental disease or defect; (2) dangerousness if released; and (3) the

absence of suitable state placement." *Williams*, 299 F.3d at 676 (quotation omitted). In addition, the Government must prove a "direct causal nexus between the mental disease or defect and dangerousness." *Id.*

"If, after the hearing, the court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall commit the person to the custody of the Attorney General." 18 U.S.C. § 4246(d). Should the court determine that commitment is warranted, the Attorney General must then hospitalize the prisoner for treatment in a suitable facility until: (1) the State in which the person is domiciled or was tried assumes responsibility for his custody, care, and treatment; or (2) "the person's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another; whichever is earlier." 18 U.S.C. § 4246(d).

This Court is therefore tasked with determining the following: (1) whether Respondent is suffering from a mental disease or defect; (2) whether Respondent will be "dangerous" if released (and if so, whether there is a "direct causal nexus" between the mental disease or defect and Respondent's dangerousness); and (3) whether suitable state placement for Respondent exists.

### III.  CONCLUSIONS OF LAW

**A.     Determination of Mental Disease or Defect**

The first issue before the Court is whether Respondent is suffering from a mental disease or defect.  Dr. Simcox testified that Respondent suffers from mild to moderate mental retardation.

Although not expressly defined in the Eighth Circuit, courts in other circuits have recognized that mental retardation is a mental defect. *See e.g. United States v. Jackson*, 553 F.2d 109, 114 (D.C. Cir. 1976) (acknowledging that, in that jurisdiction, "mental retardation is a mental defect that will support an insanity defense"); *United States v. Shawar*, 865 F.2d 856, 858 (7th Cir. 1989); *United States v. McCray*, 474 F. Supp. 2d 671, 674 (D. N.J. 2007). Respondent has submitted no evidence or argument to dispute a finding that mental retardation is a mental defect under § 4246.[3]

Based on Dr. Simcox's expert opinion and the evidence in the record, the Court concludes that the Government has satisfied its burden of showing by clear and convincing evidence that Respondent is suffering from a mental disease or defect.

## B.     Determination of Dangerousness If Released & Causal Nexus

The second issue before the Court is whether Respondent will be dangerous if released, and if so, whether there is a "direct causal nexus" between the mental disease or defect and Respondent's dangerousness.

### 1.     Dangerousness

Major factors in determining dangerousness include: (1) a history of dangerousness; (2) a history of drug or alcohol use; (3) identified potential targets; (4) previous use of weapons; (5) any recent incidents manifesting dangerousness; and (6) a history of problems taking prescribed medicines. *United States v. Ecker*, 30 F.3d 966, 970 (8th Cir. 1994). "Overt acts of violence, however, are not required to prove dangerousness." *Id.*, citing *United States v. Steil*, 916 F.2d 485,

---

[3] Although a personality disorder is not considered to be a "mental disease or defect" in and of itself, Respondent has also been diagnosed with antisocial personality disorder, with borderline features. *See Worthington v. Roper*, --- F.3d ---, 2011 WL 31529 at *2 (8th Cir. Jan. 6, 2011) (citing psychologist's conclusion that Worthington "did not have a mental disease or defect, but instead that he had antisocial personality disorder, was malingering and cocaine-dependent, and abused alcohol"). Additionally, Respondent is HIV positive, has a provisional diagnosis of pedophilia, and a history of inappropriate sexual behavior and substance abuse. (Ex. B.)

487-88 (8th Cir. 1990).

Having considered the above factors and the entire record, the Court concludes that the Government has established Respondent's dangerousness by clear and convincing evidence. Although Respondent has not targeted specific individuals, Respondent has repeatedly cut himself, has threatened to harm FMC Rochester staff and threatened to infect them with HIV, has damaged sprinkler heads and food trays (out of which he fashioned a shank), and has had varied levels of compliance with taking his medications as well as a history of overdose. (Tr. 21-27, 52.)

Moreover, as a result of his mental retardation Respondent "is quite child-like in his presentation and in his way of thinking." (Tr. 15.) Part of Respondent's dangerousness stems from the likelihood that "he would feel comfortable among children" given his "history of sexual contact with a child" and the "considerable risk that he could engage in that behavior again." (Tr. 15-16.) The risk that Respondent may engage in sexually inappropriate behavior with a child supports a finding of dangerousness.

His ability to infect others with HIV and his personality disorder further contribute to Respondent's dangerousness. Dr. Simcox testified that Respondent has threatened to infect others with HIV by scratching, biting his lip and spitting blood at staff and has "caused himself to bleed in a cell and spread it around" at FMC Rochester. (Tr. 18.) The risk that Respondent may infect others with HIV given his behavioral and sexual history adds an additional element of dangerousness to his potential release. (*See* Tr. 15.)

    **2.**    **Causal Nexus**

The Court notes that mental retardation in and of itself is not a direct cause of dangerousness. (*See* Tr. 53 ("Most people with developmental disabilities are not violent.")) According to Dr.

Simcox, it is the synergistic combination of Respondent's mental retardation with his personality disorder, substance abuse, mental illness and HIV status that results in his dangerousness. (*See* Tr. 30-31; Tr. 54 ("Another problem is you can't separate out in his behavior what's due to his personality disorder and what's due to his mental retardation. More likely it's a synergistic effect of those two problems which cause some of his primitive behaviors.")) Additionally, Dr. Simcox noted that individuals with personality disorders and substance abusers "have high instances" of aggression. (Tr. 53-54.)

Without expressly holding that a personality disorder (when present in combination with a mental disease or defect) may satisfy the "causal nexus" requirement of § 4246, the Eighth Circuit has upheld a district court commitment determination based on such a conclusion. *See United States v. Williams*, 299 F.3d 673, 678 (8th Cir. 2002) ("As we read the record, it is the combination of Williams' delusional disorder with his personality disorder that concerns the mental health experts in this case. As discussed throughout, we find this concern amply supported by the record and are further troubled by Williams' refusal to facilitate a thorough and reliable assessment of his mental health status. Under these circumstances, we cannot say that the government failed to present clear and convincing evidence that, if released, Williams poses a substantial risk of danger to persons or property as a result of his mental disease or defect."), citing *United States v. Murdoch,* 98 F.3d 472, 474, 477 (9th Cir. 1996) (affirming continued commitment where panel concluded that defendant's personality disorder with narcissistic and passive-aggressive traits "could affect his propensity to commit future acts of violence given the right circumstances" since defendant "could perceive future situations in a manner that would lead to similar dissociative episodes with possible violent acting out"), and *United States v. Henley,* 8 F. Supp. 2d 503, 507 (E.D. N.C.1998) (holding that

"synergistic effect" of prisoner's severe antisocial personality disorder and severe borderline personality disorder would result in substantial risk of danger if prisoner was released because "his disorders, in combination, substantially impair his ability to function in society and control his behavior"). Additionally, the Eight Circuit has held that expert testimony that an individual's dangerousness is "directly connected" with his mental illness and that his condition is a "significant factor" contributing to his violent behavior is "more than sufficient" to support a finding that the individual's dangerousness is a result of his mental condition. *United States v. S.A.*, 129 F.3d 995, 1001 (8th Cir. 1997).

When viewed in conjunction with his personality disorder, probable mental illness, history of substance abuse and sexual impropriety, and HIV status, Respondent's mental retardation is a mental defect that creates a danger to the public. *See United States v. Williams*, 299 F.3d 673, 678 (8th Cir. 2002). The Court finds that, through the testimony of Dr. Simcox and the evidence in the record, the Government has established a direct causal nexus between Respondent's mental disease or defect and his resulting dangerousness.

## C. Lack of State Placement Options

Respondent does not contest the absence of suitable state placement available to him. (ECF No. 13 at 3.) In light of the testimony of Pamela Seebach, the Court finds that no suitable state placement option exists for Respondent.

The Government has established (1) that Respondent is suffering from a mental disease or defect; (2) dangerousness if released (and a "direct causal nexus" between the mental disease or defect and Respondent's dangerousness); and (3) the absence of suitable state placement for

Respondent. Respondent should, therefore, be committed to the custody of the Attorney General for continued confinement at FMC Rochester until suitable state placement may be found or until Respondent's release no longer creates a substantial risk of bodily injury of another person or serious damage to the property of another pursuant to 18 U.S.C. § 4246.

### IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1) The Government's Petition to Determine Present Mental Condition of an Imprisoned Person Due for Release Under 18 U.S.C. § 4246 (ECF No. 1) be **GRANTED**; and

2) Respondent be committed to the custody of the Attorney General and hospitalized at FMC Rochester until suitable state placement may be found or until Respondent's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another, whichever is earlier.

DATED: February 16, 2011              *s/ Franklin L. Noel*
                                       FRANKLIN L. NOEL
                                       United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **March 2, 2011**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection

is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **March 2, 2011,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.